(152 App. Div. 711.)

SWENSON v. CHARLES T. WILLS, Inc., et al.

(Supreme Court, Appellate Division, Second Department. October 4, 1912.)

1. MASTER AND SERVANT (§ 150*)—DEATH OF SERVANT—NEGLIGENCE.

Intestate, an employé of an elevator company installing elevators in a new building in which the steel superstructure surrounding the elevator shaft was largely uncovered, while engaged in installing certain steel cables through loops in the various floors to carry the counterweights, went with his helper to the third floor, where a platform had been constructed over the shaft opening, on which he went to guide the cable, and while there suddenly pitched forward into the adjoining shaft, and either fell to the bottom or was struck by a descending concrete elevator, operated in the shaft by a separate company for hire by the various contractors engaged in the construction, but not in use either by defendant general contractor or by intestate's employer. Held that the place furnished intestate in which to work was reasonably safe, and that, defendants having no reason to anticipate that intestate in the discharge of his duties would fall into the adjacent well, they were not negligent, either in failing to provide a signal which would inform him of the approach of the elevator or otherwise.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 297, 299–301, 305–307; Dec. Dig. § 150.*]

2. MASTER AND SERVANT (§ 134*)—DEATH OF SERVANT—DUTY OF MASTER.

Where intestate, assisting in installing the elevators in a new building, fell down a shaft and received injuries from which he died, it was not the duty of the master or of the general contractor to suspend all work on the building while the elevators were being installed; nor were they bound to anticipate that, in the mere detail of placing cables to carry counterweights each floor should be guarded, against possible missteps or momentary loss of balance by their employés.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 269, 270, 280; Dec. Dig. § 134.*]

3. MASTER AND SERVANT (§ 121*)—DEATH OF SERVANT—LABOR LAW—GUARDING ELEVATOR SHAFT.

Labor Law (Consol. Laws 1909, c. 31) § 20, requiring the guarding of elevator shafts, was intended to prevent people from walking into such

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

shafts from the floors, and did not apply to divisions between the various wells of elevator shafts, so as to require them to be guarded against possible accidents in the work of installing the elevators.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 228-231; Dec. Dig. § 121.*]

Appeal from Trial Term, Kings County.

Action by Gurina Swenson, as administratrix, etc., of Hugo Swenson, deceased, against Charles T. Wills, Incorporated, and the Otis Elevator Company, impleaded with the Germania Life Insurance Company. From a judgment in favor of plaintiff, and from orders denying defendants' motion for new trial on the minutes, defendants Charles T. Wills, Incorporated, and the Otis Elevator Company appeal. Reversed.

Argued before HIRSCHBERG, BURR, THOMAS, WOODWARD, and RICH, JJ.

Frank V. Johnson, of New York City (Murray G. Jenkins, of New York City, on the brief), for appellant Charles T. Wills, Incorporated.

Bertrand L. Pettigrew, of New York City, for appellant Otis Elevator Co.

James I. Cuff, of New York City, for respondent.

WOODWARD, J. Plaintiff's intestate was in the employ of the defendant Otis Elevator Company on the 30th day of December, 1910. He was a mechanic of experience, and was, with five or six others, engaged in installing the elevator system in the 20-story building of the Germania Life Insurance Company at the corner of Seventeenth street and Fourth avenue in the city of New York. Charles T. Wills, Incorporated, was the general contractor for the construction of the building, and the Otis Elevator Company and others were engaged as subcontractors in carrying on various departments of the work. The steel superstructure was up, and in this there was an elevator shaft provided, outlined by the steel I-beams, for five elevators, the main shaft being divided into the five compartments by the I-beams; but otherwise there appears to have been no division between them, and the structural work, other than the steel superstructure, appears to have been largely uncompleted. In the interior of these several shafts were loops, about 58 inches long and 8 or 9 inches wide, made of steel, and at one side of the shaft, through which steel cables of five-eighths of an inch in diameter had to be placed to carry the counterweights of the elevator cars, and at the time of the accident the plaintiff's intestate, with his fellow laborers, was at work lowering these steel cables down through these loops. The cables were taken to the top of the building on reels, and then one end was started through the top loop and guided down through the others as the reel was unwound. Owing to the tendency of the cables to coil and sway, it was necessary to have men stationed at intervals of every two or three floors to guide the ends down through the loops. The men had placed

five of the six cables, and were at work in shaft No. 3. The cable had come down from the twentieth to the fourth story without any serious difficulty, and had kinked or become fouled somewhere below the fourth story. Plaintiff's intestate was with his helper, the only eyewitness of the accident, at the fourth floor; and, when the helper was unable to reach the cable and adjust the difficulty from that point, he left the helper at that point and went to the third floor, where a platform for the protection of those working below had been constructed over the entire opening of the shaft, and from that point reached up to take hold of the cable, when, for some unexplained reason, he pitched or fell forward into shaft No. 2, which was separated only by an I-beam, and four or five inches of space beyond such beam, and, it is claimed, simultaneously he was struck by a concrete elevator operated in shaft No. 2, falling to the bottom of the shaft, receiving injuries resulting in his death. The concrete elevator, a temporary machine used for carrying materials to the various floors and operated by a separate company for hire by the various contractors engaged in the work of construction, was not being used for any of the purposes of the Otis Elevator Company, nor of Charles T. Wills, Incorporated, except as the latter was the general contractor, but was engaged in carrying the materials for the concrete floors being laid far above the point of the accident.

[1] The testimony is that this freight elevator was being operated upwards at a speed of about 900 feet per minute and coming down at the rate of about 1,300 feet per minute, and that it was passing a given point at intervals of two or three minutes all of the time, so that it must be obvious that shaft No. 2 was not in any sense the place provided for the plaintiff's intestate to do his work, and the evidence is undisputed that he was engaged in shaft No. 3, and there is no suggestion that at any time in the performance of his duty there was any occasion for him to be within the limits of shaft No. 2, and it is conceded by all parties that the freight elevator did not fill the space of shaft No. 2 within four or five inches, and that the I-beam was four inches in thickness, and that the loops on the inside of the shaft were eight or nine inches, so that there was a clear space of more than one foot between the point where the plaintiff's intestate stood and the descending elevator. It is to be borne in mind that this scaffolding in shaft No. 3 was not designed as a permanent working place. The scaffolding had been built to protect workmen below, and was availed of by the plaintiff's intestate for the incidental purpose of guiding a cable through a loop in the interior of this particular shaft in the general work of installing the elevator system for the building, and the theory on which this case was presented to the jury, that it had a right to determine whether the defendants had used reasonable care in failing to provide for a signal which should inform the decedent of the approach of the freight elevator, is absurd. No such duty is cast upon an employer by the laws of this state. The whole situation was known to the plaintiff's in-

testate as well as it could have been known to the defendants, had they been personally present. The elevator was running up and down in an open shaft at intervals of two minutes more or less, according to signals and at a rapid rate, and there was no occasion for the plaintiff's intestate, working in the installation of the elevator system, to be inside of shaft No. 2. No one anticipated that he would go into shaft No. 2 in the threading of the cable in shaft No. 3, and it was only because of a kink in the particular cable just as it was reaching the third floor, where it was testified the other cables were coiled up, because they could go no lower, that the plaintiff's intestate was called upon to be in the shaft upon this floor at all. There was a pause in the falling of the cable, and he went to the third floor and reached up to get hold of it, when he pitched forward or fell forward into the shaft in front of him, and the descending elevator hit him, and he was found at the foot of the shaft injured fatally.

Whether he would have fallen without the intervention of the descending elevator in such a manner as to produce the injuries is merely a matter of speculation. The evidence goes no farther than to show that he was within the shaft lines of No. 3; that he had a signal hammer in one hand; that he reached up with the other hand, looking up; that he did not have hold of the cable or anything else, and that he fell or surged forward into the line of shaft No. 2. No evidence whatever is given from which the inference might be drawn that he could have saved himself from going down the shaft, even though the freight elevator had not come down upon him. Indeed, there is practically no evidence that the elevator actually hit him. The testimony does not show any fact from which this can be stated definitely. The only eyewitness testifies to the falling forward into the shaft No. 2, and says almost simultaneously the elevator came down and caught him; but he was standing at the fourth floor, upon the loop in the side of the shaft next to shaft No. 2, or almost directly above the decedent where he stood at the time of the fall, and how he could determine that the elevator caught him, in the sense of producing the fall which resulted in the intestate's death, is difficult to understand. Indeed, he does not attempt to say that it was the elevator catching him which actually produced the fall. The effect of his testimony is that the plaintiff's intestate fell into the elevator shaft of No. 2, and that the elevator caught him; but whether it caught him in such a sense that it was the proximate cause of the injuries is merely a matter of guesswork. No evidence is given of the character of the injuries, from which an inference can be drawn that the descending elevator caused the final fall down the shaft. It might, descending from the twentieth story, practically without restraint, fall very much faster than the decedent starting from the third story, and it might have caught him; but there is no evidence that the intestate merely intruded his body incidentally and was crushed down by the oncoming elevator. Indeed, the weight of evidence is that the plaintiff's intestate had already fallen, and that the elevator merely overtook him in the fall, and, as there can be no certainty as to which of these ade-

quate causes was the proximate cause, it is entirely evident that the defendants, who had no means of anticipating that he would, in the discharge of this detail of his labors, fall over into the adjacent shaft, there can be no legitimate ground for the verdict in this case.

[2, 3] The master's duty was to furnish plaintiff's intestate with a reasonably safe place in which to perform his work, and from the record in this case no one can question that the 20-story building under construction was a reasonably safe place in which to employ the decedent in the installation of an elevator. It was not the duty of either the master or the general contractor to suspend all work upon the building while the elevators were being installed. It was not their duty to see to it that employés could not be injured. It was their duty to use reasonable care in the performance of any duty which belonged to them to perform; but they were not bound to anticipate that in the mere detail of placing the cables for the carrying of the counterweights that each and every floor should be guarded against possible missteps or momentary losses of balance on the part of employés. At the points above the accident, where the decedent and his helper had been, only the I-beams were available to step upon; but at the particular point of the accident there was a complete covering of the shaft space in the third shaft. It was, apparently, as safe as the floor would have been, if it had been laid over the shaft, and because the decedent, while reaching up to get hold of the cable, fell forward into the shaft, is not evidence of the neglect of any duty which either the master or the general contractor owed to him; the trial court holding properly that the case was not within the contemplation of section 20 of the Labor Law, requiring the guarding of elevator shafts, in that the situation presented here was merely the division of the elevator shaft, and that it was not intended to guard against possible accidents in the work of installing elevators within such shafts, but rather to prevent people from walking into shafts from the floors.

As there was no actionable negligence on the part of either of the defendants, as disclosed by the evidence in this case, the judgment and orders appealed from should be reversed, and a new trial granted, costs to abide the event. All concur.